IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

DERRICK DEXTER NORFLEET, JR.,
     Plaintiff,

vs.                           Case No.:  3:16cv413/MCR/EMT

LIEUTENANT G. TAYLOR, et al.,
     Defendants.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Derrick Dexter Norfleet, Jr. ("Norfleet"), an inmate of the Florida Department of Corrections ("FDOC"), proceeds pro se and in forma pauperis in this action brought under 42 U.S.C. § 1983.  Presently before the court is a motion to dismiss filed by Defendant Lane, and a motion for summary judgment filed by Defendant Taylor (ECF Nos. 32, 40).  Norfleet has not filed a response to either motion.

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N. D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1)(B)(C); Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by the parties, it is the opinion of the undersigned that Defendant Taylor's motion for summary judgment should be granted, and Defendant Lane's motion to dismiss should be granted in part.

## I.    BACKGROUND AND INTRODUCTION

At all times relevant to this action, Norfleet was incarcerated at the Santa Rosa Correctional Institution Annex (*see* Second Amended Complaint, ECF No. 12 at 5–6, 8–11).[1]   Lieutenant G. Taylor, Officer Brandon Lane, and "Officer Carter" were members of the security staff at Santa Rosa C.I. (*see id.*).[2]   Norfleet claims that Officer Lane was deliberately indifferent to his safety by failing to protect him from an assault by Inmate Bobby Taylor on February 5, 2016 (*id.* at 5–12).   Norfleet claims that Lieutenant Taylor conspired with Officer Lane to cover up the assault by Inmate Taylor by falsifying a disciplinary charge against Norfleet (*id.*).   Norfleet claims that as a result of the false disciplinary charge, he was placed in disciplinary confinement for sixty days and placed on a more restrictive custody status (*id.* at 10–11).   Norfleet claims he suffered physical, mental, and emotional injuries as a result of Defendants' conduct (*see id.* at 7, 10–11).

---

[1] The page numbers referenced in this Report and Recommendation are the page numbers automatically assigned by the court's electronic filing system.

[2] Apparently, Defendant Taylor was a Lieutenant, and Defendant Lane was an Officer, at the time of the events underlying this case, but they have since been elevated to the rank of Captain and Sergeant, respectively.  The court will refer to each Defendant by his rank at the time of the events of this case.  With respect to the correctional officer whom Norfleet identifies as "Officer Carter," this Defendant has not yet been served.  In fact his actual identity has not been determined.  The court is attempting to ascertain the identity and location of that correctional officer (*see* ECF No. 42).

Norfleet sues Defendants only in their individual capacities, claiming that their conduct violated the Eighth Amendment and the constitutional prohibition against retaliation (ECF No. 12 at 1, 7, 11–12).  Norfleet seeks compensatory and punitive damages (*id.* at 7, 12).  He also includes a general prayer for relief, which the court liberally construes as including a request for nominal damages (*see id.* at 12).  *See, e.g.*, Carey v. Piphus, 435 U.S. 247, 255, 98 S. Ct. 1042, 55 L. Ed. 2d 252 (1978) (stating that nominal damages may be appropriate if a plaintiff establishes a violation of a constitutional right, even if he cannot prove actual physical injury sufficient to entitle him to compensatory damages); Hughes v. Lott, 350 F.3d 1157, 1162 (11th Cir. 2003) ("Nominal damages are appropriate if a plaintiff establishes a violation of a fundamental constitutional right, even if he cannot prove actual injury sufficient to entitle him to compensatory damages."); Hale v. Sec'y for Dep't of Corr., 345 F. App'x 489, 492 (11th Cir. 2009) (unpublished) (pro se state prisoner was not precluded from seeking nominal damages in § 1983 claim for his alleged emotional or mental injury due to his continued retention in close management confinement, which was allegedly in retaliation of his filing of an administrative grievance, as would violate his First Amendment rights, and district court erred by failing to liberally construe prisoner's pro se pleadings); Williams v. Brown, 347 F. App'x 429, 436 (11th Cir. 2009) (unpublished) (same).

Defendants Officer Lane and Lieutenant Taylor contend Norfleet's allegations fail to state a plausible Eighth Amendment violation or retaliation claim, and that they are entitled to qualified immunity (ECF Nos. 32, 40).  Lane and Taylor also contend Norfleet is precluded from recovering monetary damages, pursuant to 42 U.S.C. § 1997e(e) (*id.*).

## II.    LEGAL STANDARDS

### A.    Summary Judgment

In order to prevail on a motion for summary judgment, the moving party must show that the nonmoving party has no evidence to support his or her case or present affirmative evidence that the nonmoving party will be unable to prove his or her case at trial.  *See* Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  If the moving party successfully negates an essential element of the nonmoving party's case, the burden shifts to the nonmoving party to come forward with evidentiary material demonstrating a genuine issue of fact for trial.  *Id.*  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Id.*, 477 U.S. at 248.  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*  The nonmoving party must show more than the existence of a "metaphysical doubt" regarding the material facts.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  Speculation or conjecture from a party cannot create a genuine issue of material fact. *See* Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005).  "A mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment."  Young v. City of Palm Bay, Fla., 358 F.3d 859, 860 (11th Cir. 2004); *see also* Celotex Corp., 477 U.S. at 324.  The nonmoving party must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *See* Celotex Corp., *supra*; Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997) (Rule 56 requires the nonmoving party to go beyond the pleadings and by his or her own affidavits, or by the depositions, documents, affidavits or declarations, admissions, interrogatory answers or other materials on file designate specific facts showing that there is a genuine issue for trial); Hammer v. Slater, 20 F.3d 1137 (11th Cir. 1994).

With regard to the factual positions asserted by the parties, the court must apply the standard set forth in Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> **(1) Supporting Factual Positions.**  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
>> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>>
>> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> . . . .
>
> **(4) Affidavits or Declarations.**  An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c) (2010).

Facts asserted in hearsay statements which are not subject to a hearsay exception, and thus would not be admissible in evidence, are insufficient to show that a fact is genuinely disputed.  "The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial."  Jones v. UPS Ground Freight, 683 F.3d 1283, 1294 (11th Cir. 2012) (citing

Pritchard v. S. Co. Servs., 92 F.3d 1130, 1135 (11th Cir. 1996)).  If a fact cannot be

presented in a form that would be admissible in evidence, it cannot be used for

purposes of summary judgment.  *See* Macuba v. Deboer, 193 F.3d 1316, 1322 (11th

Cir. 1999); *see* Fed. R. Civ. P. 56(c).

    If a party fails to properly support an assertion of fact or fails to properly

address another party's assertion of fact as required by Rule 56(c), the court will

consider the fact undisputed for purposes of the motion for summary judgment, or

grant summary judgment if the moving party's motion and supporting

materials—including the facts considered undisputed—show that the moving party is

entitled to it.  *See* Fed. R. Civ. P. 56(e)(2, 3) (2010).

    Evidence presented by the nonmoving party in opposition to the motion for

summary judgment, and all reasonable factual inferences arising from it, must be

viewed in the light most favorable to him or her.  *See* Adickes v. S. H. Kress & Co.,

398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); Jones v. Cannon, 174 F.3d

1271, 1282 (11th Cir. 1999).  Nonetheless, the nonmoving party still bears the burden

of coming forward with sufficient evidence of every element that he or she must

prove.  *See* Celotex Corp., 477 U.S. at 317.  A motion for summary judgment should

be granted if "the movant shows that there is no genuine dispute as to any material fact

and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a);

Celotex Corp., 477 U.S. at 322.

    B.    <u>Failure to State a Plausible Claim</u>

The court is statutorily required to review a prisoner complaint to determine

whether the action is frivolous or malicious, fails to state a claim on which relief may

be granted, or seeks monetary relief against a defendant who is immune from such

relief. *See* 28 U.S.C. §§ 1915(e)(2)(B), 1915A. To survive dismissal at the screening

phase, a complaint must contain sufficient factual matter, accepted as true, to state a

claim to relief that is plausible on its face. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678, 129

S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (internal quotation marks and citation omitted).

A claim is plausible on its face where "the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Id.* (citation omitted). Plausibility means "more than a sheer

possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts

that are merely consistent with a defendant's liability, it stops short of the line between

possibility and plausibility of entitlement to relief." *Id.* (quotation and citation

omitted).

The determination of whether a complaint states a plausible claim for relief is

"a context-specific task that requires the reviewing court to draw on its judicial

experience and common sense." <u>Iqbal</u>, 556 U.S. at 679 (citation omitted). The pleader

is not entitled to relief "where the well-pleaded facts do not permit the court to infer

more than the mere possibility of misconduct." *Id.* (citing Fed. R. Civ. P. 8(a)(2)).

The court is "not bound to accept as true a legal conclusion couched as a factual

allegation." *Id.* at 678 (quotation and citation omitted). And "bare assertions" that

"amount to nothing more than a formulaic recitation of the elements" of a claim "are

conclusory and not entitled to be assumed true." *Id.* at 681 (quotation and citation

omitted). Stated succinctly:

> Pleadings that, because they are no more than conclusions, are not
> entitled to the assumption of truth. While legal conclusions can provide
> the framework of a complaint, they must be supported by factual
> allegations. When there are well-pleaded factual allegations, a court
> should assume their veracity and then determine whether they plausibly
> give rise to an entitlement to relief.

<u>Iqbal</u>, 556 U.S. at 679. In civil rights cases, "[m]ore than mere conclusory notice

pleading is required . . . . A complaint will be dismissed as insufficient where the

allegations it contains are vague and conclusory." <u>Gonzalez v. Reno</u>, 325 F.3d 1228,

1235 (11th Cir. 2003) (quotation marks and alteration omitted).

C.    <u>Qualified Immunity</u>

The defense of qualified immunity shields government officials performing

discretionary acts "from liability for civil damages insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982); Hadley v. Gutierrez, 526 F.3d 1324, 1329 (11th Cir. 2008).

"Under the qualified immunity doctrine, government officials performing discretionary functions are immune not just from liability, but from suit, unless the conduct which is the basis for suit violates clearly established federal statutory or constitutional rights of which a reasonable person would have known." Sanders v. Howze, 177 F.3d 1245, 1249 (11th Cir. 1999) (citing Harlow, 457 U.S. at 818).

"Because qualified immunity is a defense not only from liability, but also from suit, it is important for a court to ascertain the validity of a qualified immunity defense as early in the lawsuit as possible." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citation omitted). To be entitled to qualified immunity, a public official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Id. (internal quotation marks and citations omitted).

"Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Lee, 284 F.3d at 1194. "In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." Tolan v. Cotton, —

U.S. —, 134 S. Ct. 1861, 1865, 188 L. Ed. 2d 895 (2014). "The first asks whether the facts, taken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a federal right. . . . The second . . . asks whether the right in question was 'clearly established' at the time of the violation." *Id.*, 134 S. Ct. at 1865–66 (citations, internal quotation marks, and alterations omitted) (first ellipsis in original). The court has discretion to decide which question to address first. *See* Pearson v. Callahan, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).

Qualified immunity protects all but the plainly incompetent or those who knowingly violate federal law; it does not extend to one who knew or reasonably should have known that his or her actions would violate the plaintiff's federal rights. *See* Jones v. Fransen, 857 F.3d 843, 851 (11th Cir. 2017) (citations and quotation marks omitted). The defense gives government officials "breathing room to make reasonable but mistaken judgments about open legal questions." Ashcroft v. al–Kidd, 563 U.S. 731, 743, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011). In part, this defense recognizes the problems that government officials like correctional officers face in performing their jobs in dynamic and sometimes perilous situations. It is also designed to avoid excessive disruption of government services and to provide a direct way to end insubstantial claims on summary judgment. *Id.*

The clearly established law requirement provides government officials with the ability to anticipate what conduct will give rise to liability for a constitutional violation. *See* <u>Anderson v. Creighton</u>, 483 U.S. 635, 646, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).  To that end, when officials are acting within their discretionary capacity, they "can know that they will not be held personally liable as long as their actions are reasonable in light of current American law." *Id.*  "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that <u>every</u> 'reasonable official would have understood that what he is doing violates that right.'"  <u>Al-Kidd</u>, 563 U.S. at 741 (quoting <u>Anderson</u>, 483 U.S. at 640) (emphasis added).  This imposes an objective standard, and that objective standard is "measured by reference to clearly established law." <u>Harlow</u>, 457 U.S. at 818.

Because this objective standard is fundamental to the qualified immunity defense, the district court, in ruling on a motion for summary judgment, should determine if the law was clearly established at the time the incident occurred.  As the Supreme Court explained:

> If the law at the time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful . . . .  If the law was clearly established,

> the immunity defense ordinarily should fail, since a reasonably competent
> public official should know the law governing his conduct.

Harlow, 457 U.S. at 818–19.  In this way, both government officials and citizens are

protected.  If the law is not clearly established, then the court should dismiss the case

against the government official.  If the law was clearly established, then the claim

against the government official should go forward, and summary judgment should be

denied.

Authoritative judicial decisions may "establish broad principles of law" that are

clearly applicable to the conduct at issue, and it may also be obvious from "explicit

statutory or constitutional statements" that certain conduct is unconstitutional.  Griffin

Indus., Inc. v. Irvin, 496 F.3d 1189, 1209 (11th Cir. 2007); *see also* Taylor v. Barkes,

— U.S. —, 135 S. Ct. 2042, 2044, 192 L. Ed. 2d 78 (2015) ("We do not require a case

directly on point, but existing precedent must have placed the . . . constitutional

question beyond debate.").  Furthermore, recognizing that the clearly established law

question turns on the law at the time of the incident, the district court must consider

the law "in light of the specific context of the case, not as a broad general proposition

. . . ."  Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).

In other words, the facts of the case before the court must be materially similar to the

facts in the precedent that clearly establishes the deprivation.  *See* Merricks v.

Adkisson, 785 F.3d 553, 559 (11th Cir. 2015) (citation omitted). To be clearly established, the precedent must give officials clear warning of unconstitutional conduct. *Id.*

In considering the law to do this analysis, the district court should compare the facts of the case before the court that allege a constitutional deprivation with those cases that the party opposing the motion contends show the clearly established nature of the law. As the Eleventh Circuit has explained:

> For qualified immunity purposes, a pre-existing precedent is materially similar to the circumstances facing the official when the specific circumstances facing the official are enough like the facts in the precedent that no reasonable, similarly situated official could believe that the factual differences between the precedent and the circumstances facing the official might make a difference to the conclusion about whether the official's conduct was lawful or unlawful, in the light of the precedent. Thus, every fact need not be identical. Minor variations in some facts (the precedent lacks arguably significant fact or contains an additional arguably significant fact not in the circumstances now facing the official) might be very important and, therefore, be able to make the circumstances facing an official materially different than the pre-existing precedents, leaving the law applicable—in the circumstances facing the official—not clearly established when the defendant acted.

Merricks, 785 F.3d at 559 (internal quotation marks omitted).

Earlier this year, the Supreme Court observed:

> In the last five years, this Court has issued a number of opinions reversing federal courts in qualified immunity cases. The Court has found this necessary both because qualified immunity is important to society as a whole, and because as an immunity from suit, qualified

immunity is effectively lost if a case is erroneously permitted to go to trial.

Today, it is again necessary to reiterate the longstanding principle that "clearly established law" should not be defined at a high level of generality. As this Court explained decades ago, the clearly established law must be "particularized" to the facts of the case. Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.

White v. Pauly, — U.S. —, 137 S. Ct. 548, 551–52, 196 L. Ed. 2d 463 (2017) (multiple citations, some quotation marks, and alterations omitted).

The court cannot consider just any case law to decide if a right was clearly established. Only binding opinions from the United States Supreme Court, the Eleventh Circuit Court of Appeals, and the highest court in the state where the action is filed, can serve as precedent for this analysis. *See* McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007).

D.    Eighth Amendment Failure-to-Protect Claims

Under the Eighth Amendment, "prison officials have a duty to protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) (citations omitted); *see also* Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099 (11th Cir. 2014); Rodriguez v. Sec'y for the Dep't of Corr, 508 F.3d 611, 616–17 (11th Cir. 2007); Purcell ex. rel. Estate of

Morgan v. Toombs Cnty., Ga., 400 F.3d 1313, 1319 (11th Cir. 2005); Carter v. Galloway, 352 F.3d 1346, 1349 (11th Cir. 2003).

A prison official violates the Eighth Amendment "when a substantial risk of serious harm, *of which the official is subjectively aware*, exists and the official does not respond reasonably to the risk." Carter, 352 F.3d at (internal quotation marks omitted) (alterations adopted) (emphasis added); *see also* Farmer, 511 U.S. at 828 ("A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment.").  To survive summary judgment on a deliberate indifference failure-to-protect claim, "a plaintiff must produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendant's deliberate indifference to that risk; and (3) causation."  Goodman v. Kimbrough, 718 F.3d 1325, 1331 (11th Cir. 2013) (internal quotation marks omitted).

"When examining the first element—a substantial risk of serious harm—the court uses an objective standard." Caldwell, 748 F.3d at 1099 (citation omitted).

The second element—deliberate indifference in the context of a failure to prevent harm—has a subjective and an objective component.  *See* Caldwell, 748 F.3d at 1099.  To satisfy the subjective component, a plaintiff must produce evidence that the defendant "actually (subjectively) knew that an inmate faced a substantial risk of serious harm." *Id.* (citing Rodriguez, 508 F.3d at 617).  The defendant "must both be

aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. "The known risk of injury must be a strong likelihood, rather than a mere possibility before a correctional officer's failure to act can constitute deliberate indifference." Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990) (internal quotation marks and citations omitted). The "risk calculation is a prospective determination of what might happen based upon events that have already occurred." Brooks v. Warden, 800 F.3d 1295, 1301–02 (11th Cir. 2015). It does "not allow the advantage of hindsight to determine whether conditions of confinement amounted to 'cruel and unusual' punishment." Id. (quoting Purcell, 400 F.3d at 1320). Further, the claim requires the defendant to be subjectively aware "of a particularized threat or fear felt by [p]laintiff." Carter, 352 F.3d at 1350. Whether a prison official had the requisite awareness of the risk "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Farmer, 511 U.S. at 842 (citation omitted). At the same time, the deliberate indifference standard—and the subjective awareness required by it—is far more onerous than normal tort-based standards of conduct sounding in negligence. Goodman v. Kimbrough, 718 F.3d 1325, 1332 (11th Cir. 2013) (citation omitted).

To satisfy the objective component of the deliberate indifference element, a plaintiff must produce evidence that the defendant "disregard[ed] that known risk by failing to respond to it in an (objectively) reasonable manner." Rodriguez, 508 F.3d at 617.

Prison officials may escape liability on a deliberate indifference claim if they show, for example, that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent. See Farmer, 511 U.S. at 844. "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment" and does not give rise to a constitutional violation. Id. at 838.

E.    Retaliation Claims

The First Amendment forbids prison officials from retaliating against prisoners for exercising the right of free speech. See Crawford-El v Britton, 523 U.S. 574, 588 n.10, 592–93, 118 S. Ct. 1584, 140 L. Ed. 2d 759 (1998); Farrow v. West, 320 F.3d 1235, 1248 (11th Cir. 2003) (citations omitted). "First Amendment rights to free speech and to petition the government for a redress of grievances are violated when a prisoner

is punished for filing a grievance concerning the conditions of his imprisonment."

Boxer X v. Harris, 437 F.3d 1107, 1112 (11th Cir. 2006).  To prevail on a claim of

retaliation, the inmate must establish these elements:   (1) his speech was

constitutionally protected; (2) the defendant's retaliatory conduct adversely affected the

protected speech; and (3) there is a causal relationship between the retaliatory action

and the protected speech.  *See* Douglas v. Yates, 535 F.3d 1316, 1321 (11th Cir. 2008)

(citing Bennett v. Hendrix, 423 F.3d 1247, 1250, 1254 (11th Cir. 2005)).  A prisoner's

filing of a grievance concerning the conditions of his imprisonment is protected speech

under the First Amendment.  *See* Douglas, 535 F.3d at 1321 (internal quotation marks

and citation omitted).  As to the second element, the Eleventh Circuit employs a purely

objective standard:  "A plaintiff suffers adverse action if the defendant's allegedly

retaliatory conduct would likely deter a person of ordinary firmness from the exercise

of First Amendment rights."  Bennett, 423 F.3d at 1253.  In adopting this objective

standard, the Eleventh Circuit expressly rejected a subjective "actual chill" standard;

in other words, a plaintiff need not show that the retaliatory conduct actually chilled

his exercise of his First Amendment rights, rather, he need only show that the

retaliatory acts would likely deter a person of ordinary firmness from exercising his or

her First Amendment rights.  *Id.* at 1254.

The third element, whether there was a causal connection between the retaliatory acts and the adverse effect on the speech, "asks whether the defendants were subjectively motivated to discipline because [the prisoner] complained of the conditions of his confinement." Smith v. Mosley, 532 F.3d 1270, 1278 (11th Cir. 2008).  The subjective motivation issue is resolved under the burden-shifting formula of Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977).  *See* Hartman v. Moore, 547 U.S. 250, 260, 126 S. Ct. 1695, 64 L. Ed. 2d 441 (2006) (citing Mt. Healthy, 429 U.S. at 285–87; Crawford-El, 523 U.S. at 593); Smith, 532 F.3d at 1278.  Initially, the plaintiff must plead and provide sufficient evidence of the retaliatory motive and the adverse action.  *See* Hartman, 547 U.S. at 259–60.  "[U]pon a prima facie showing of retaliatory harm, the burden shifts to the defendant official to demonstrate that even without the impetus to retaliate he would have taken the action complained of . . . ."  *Id.* at 260 (citing Mt. Healthy, 429 U.S. at 287).  In the context of a defendant's motion for summary judgment, however, the plaintiff has the ultimate burden of proof; therefore, the defendant need only point to evidence as to the legitimate reason, and the plaintiff must produce "affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive." Crawford-El, 523 U.S. at 600 (citing Liberty Lobby, Inc., 477 U.S. at 256–57).  And, because regulatory actions taken by prison officials

are presumed to be reasonable, the inmate must produce "specific, nonconclusory factual allegations that establish improper motive causing cognizable injury." Crawford-El, 523 U.S. at 598 (citation omitted); Harris v. Ostrout, 65 F.3d 912, 916–17 (11th Cir. 1995).  To defeat a summary judgment motion, a plaintiff need not adduce clear and convincing evidence of improper motive, but he must produce evidence from which a jury could find by a preponderance of the evidence that retaliation was the but-for cause of the challenged action.  See Crawford-El, 523 U.S. at 590–95, 600. "If there is a finding that retaliation was not the but-for cause of the action complained of, the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind." Hartman, 547 U.S. at 260 (citing Mt. Healthy, 429 U.S. at 287); see also Crawford-El, 523 U.S. at 593.  Indeed, "action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway." Hartman, supra (citing Crawford-El, 523 U.S. at 593; Mt. Healthy, 429 U.S. at 285–86). However, "when nonretaliatory grounds are in fact insufficient to provoke the adverse consequences, . . . retaliation is subject to recovery as the but-for cause of official action offending the Constitution." Hartman, 547 U.S. at 256 (citing Crawford-El, 523 U.S. at 593; Mt. Healthy, 429 U.S. at 283–84).

F.     Limitation on Recovery

The Prison Litigation Reform Act precludes a prisoner plaintiff from recovering compensatory and punitive damages in the absence of a physical injury. *See* 42 U.S.C. § 1997e(e); *see also* <u>Al-Amin v. Smith</u>, 637 F.3d 1192, 1198 (11th Cir. 2011) (compensatory and punitive damages are not recoverable without a physical injury). To satisfy § 1997e(e)'s physical injury requirement, the physical injury must be more than de minimis, but need not be significant. *See* <u>Harris v. Garner</u>, 190 F.3d 1279, 1286 (11th Cir. 1999), *vacated in part on other grounds*, 216 F.3d 970 (11th Cir. 2000) (en banc).

## III.    MATERIAL FACTS

As this case comes before the court on Officer Lane's motion to dismiss and Lieutenant Taylor's motion for summary judgment, the court is required to view the facts in the light most favorable to Norfleet, the nonmoving party. *See* <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 918 (11th Cir. 1993); *see also* <u>Iqbal</u>, 556 U.S. at 679. The court does so here, referring to Norfleet's verified Second Amended Complaint (ECF No. 12) and taking those facts from the parties' pleadings and summary judgment materials of record. *See* <u>Perry v. Thompson</u>, 786 F.2d 1093, 1095 (11th Cir. 1986) (holding that specific facts pled in a sworn complaint must be considered in opposition to summary judgment); Fed. R. Civ. P. 56(c); N.D. Fla. Loc. R. 56.1(B), (C), (F). Nevertheless, the court observes that what are stated as "facts"

herein for purposes of summary judgment review may not be the actual facts. *See* Montoute v. Carr, 114 F.3d 181, 182 (11th Cir. 1997).

On January 25, 2016, a group of 30–40 inmates housed at Florida State Prison, including Norfleet and Inmate Bobby Taylor, were told they were being transferred to Santa Rosa C.I. the next morning (Second Amended Complaint at 5). Inmate Taylor continuously kicked his cell door throughout the night, yelling obscenities and threats at correctional officers and threatening to rape and murder random inmates on the bus ride to Santa Rosa C.I. (*id.*).

Upon arriving at Santa Rosa C.I. on January 26, 2016, Norfleet notified a classification officer that he was a "PREA designee," meaning, he wished to report an incident of sexual abuse, pursuant to the Prison Rape Elimination Act (Second Amended Complaint at 5). The classification officer told Norfleet that upon his receiving a housing assignment, the classification officer assigned to Norfleet's dormitory would conduct a PREA interview (*see id.*). Norfleet and Bobby Taylor were assigned to the same cell in E-dormitory (*id.*).

Lieutenant Taylor was the housing officer in E-dormitory, but was not responsible for making inmate cell assignments and did not have the authority to change cell assignments unless an inmate was violating prison rules or experiencing

medical problems (Declaration of Capt. Gilbert L. Taylor ¶ 4, ECF No. 40-1, Ex. H). Inmate Bobby Taylor was not classified as a safety or security threat (*see id.* ¶ 5).

On January 29, 2016, Lieutenant Taylor went to Norfleet's cell and told him it was time for his PREA interview (Second Amended Complaint at 6). As Norfleet was getting dressed, Lieutenant Taylor told him there was no reason for Norfleet to attend the interview, because he would be asked the same questions as a previous interview (*id.*). Norfleet alleges Lieutenant Taylor then summoned Inmate Bobby Taylor to the cell door and began talking about "the good ol' days," when Lieutenant Taylor was a housing sergeant at Santa Rosa C.I., and Inmate Taylor was housed in the dormitory he supervised (*id.*). Norfleet alleges Lieutenant Taylor "recalled violent incidents that were allowed to happen to inmate snitches" during that time, and commented that prison had "gotten soft because of snitches" (*id.*). Norfleet interpreted Lieutenant Taylor's comments as a threat that he would suffer violence if he attended the PREA interview, so Norfleet declined to go to the interview (*id.*).

One week later, on February 5, 2016, while Defendant "Officer Carter" was serving dinner, Norfleet signaled to Carter to "please get me out this [sic] room" (Second Amended Complaint at 6). Officer Carter told Norfleet in a loud voice, "I'm not changing nobody [sic] cell. If you 'check in' at Santa Rosa, you'll get a DR [disciplinary report] that will stick" (*id.*). Norfleet states "checking in" refers to an

inmate's notifying an officer that he and another inmate are "having problems" that may result in physical harm, and that he is afraid to fight the other inmate and would like to resolve the problem peacefully by being moved to another cell (*id.*).  Officer Carter told Inmate Taylor, "You know the drill," and that he (Carter) would be working in the dormitory all night (*id.*).

After dinner, Inmate Taylor approached Norfleet from behind and grabbed, caressed, and squeezed Norfleet's buttock, and attempted to maneuver his hand into Norfleet's anus area (Second Amended Complaint at 6).  Norfleet turned around and saw that Inmate Taylor was holding a long, thin knife in his hand (*id.* at 7).  Norfleet pleaded with Inmate Taylor to allow him to request a cell change (*id.*).   At approximately 8:00 that evening, Officer Lane and Officer Carter approached Norfleet and Taylor's cell (*id.* at 8).  Norfleet asked Lane and Carter to move him out of the cell (*id.*).  When Officer Lane asked why, Norfleet responded that he and Inmate Taylor were "having a conflict," that Inmate Taylor had physically threatened him, and that he was afraid of Inmate Taylor (*id.*).  Officer Carter again told Norfleet there was no "checkin in" at Santa Rosa C.I. (*see id.* at 6, 8).  Norfleet alleges Officer Carter threatened to charge Norfleet with a DR if Norfleet persisted in requesting a cell change (*id.* at 8).  Norfleet alleges Inmate Taylor referred to him (Norfleet) as a "soft ass

nigga," and yelled that Norfleet did not need to be moved to another cell (*id.*).[3]

Norfleet alleges Inmate Taylor told Officers Lane and Carter, "I got this.  Y'all already

know." (*id.*)  Officers Lane and Carter walked away from the cell (*id.*).

Later that evening, Officer Lane removed Inmate Taylor from the cell and

escorted him to the shower (Second Amended Complaint at 8).  Officer Carter

escorted Norfleet to the shower via a different route (*id.*).  After the showers, Officers

Lane and Carter returned Norfleet and Inmate Taylor to the cell (*id.* at 9).  Officer Lane

told Inmate Taylor to wait until he and Officer Carter were downstairs to "do whatever

he [Inmate Taylor] was going to do." (*id.*).  Lane and Carter then went downstairs

(*id.*).

Inmate Taylor turned to Norfleet and demanded that Norfleet perform oral sex

before Officers Lane and Carter returned (Second Amended Complaint at 9).  Norfleet

refused Taylor's demand (*id.*).  Inmate Taylor pulled the knife out of his boxer shorts,

repeated his demand, and threatened to stab Norfleet if he refused (*id.*).  In an effort

to "stall for time," Norfleet told Taylor he would comply if Taylor allowed him to

finish drying off from the shower (*id.*).  After "what seemed like 5–10 minutes,"

Norfleet heard the jingle of Officer Carter's keys (*id.*).  Inmate Taylor positioned

---

[3] Because Defendant Officer Lane's dispositive motion is a motion to dismiss, not a motion for summary judgment, the evidentiary restrictions of Rule 56(c), including the restrictions on consideration of hearsay statements, do not apply.

himself at the cell door and held the knife in his boxer shorts (*id.*).  Norfleet yelled that

he was getting out of the cell, and attempted to run for the door, but Inmate Taylor

blocked him (*id.*).  Inmate Taylor turned slightly, and Norfleet lunged at him, grabbing

Taylor's right arm and wrist with both hands to prevent Taylor from pulling the knife

completely out of his boxer shorts (*id.*).  Inmate Taylor began punching Norfleet in the

face, head, nose, and jaw with a closed fist (*id.*).  Inmate Taylor threatened to kill

Norfleet while beating Norfleet in the face and striking him in the head (*id.*).  The

beating lasted approximately 5 minutes (*id.*).  When Officer Carter approached the cell,

Inmate Taylor was still beating Norfleet in the face with his fist (*id.*).  Norfleet still had

a grip on Taylor's right arm and wrist (*id.*).  Norfleet pleaded with Taylor to stop

hitting him (*id.*).  Officers Lane and Carter watched as the beating continued (*id.*).

Inmate Taylor did not stop hitting Norfleet until Norfleet agreed not to "snitch" on him

(*id.*).  According to Norfleet, blood was on the desk, floor, and walls of the cell (*id.*

at 10).  Officers Lane and Carter handcuffed Norfleet but refused to open the cell door

until Norfleet agreed to say that he initiated the attack on Inmate Taylor (*id.*).  Lane and

Carter told Norfleet he would not be charged with a disciplinary infraction if he

followed their instructions (*id.*).

Officers Lane and Carter escorted Norfleet to a shower and told him to "stick

to the story" (Second Amended Complaint at 10).   The dormitory sergeant

subsequently escorted Norfleet to the medical department and took pictures of some, but not all, of Norfleet's injuries (*id.*). Officers Lane and Carter arrived at the medical department and asked to relieve the dormitory sergeant (*id.*). The nurse asked Norfleet to explain what happened to his face (*id.*). Norfleet responded that he beat himself up, because he feared retaliation from Officers Lane and Carter (*id.*).

Officers Lane and Carter escorted Norfleet to a different dormitory (Second Amended Complaint at 10). During the escort, Officer Lane told Norfleet that he spoke to "the Lieutenant," and if Norfleet kept his mouth shut, he would not be charged with a disciplinary infraction (*id.*). Lieutenant Taylor was not on duty the evening of February 5, 2016 (Taylor Decl. ¶ 10).

On the next day, February 6, 2016, Officer Lane issued a DR charging Norfleet with assault or attempted assault on an inmate (Disciplinary Report Worksheet, ECF No. 40-1, Ex. A). In the DR, Lane stated that he saw Norfleet jump off the top bunk and start punching Inmate Taylor in the face, and Inmate Taylor pushed Norfleet in an attempt to cease the altercation (*id.*). Officer Lane attached photographs of Norfleet's and Inmate Taylor's injuries to the DR (*see id.*). Lieutenant Stokes, who is not a Defendant in this case, approved the DR (*id.*). Norfleet alleges Officer Lane's statements in the DR were false (Second Amended Complaint at 11). Norfleet

remained in his current custody status, Close Management II, pending action by the disciplinary team (Disciplinary Report Worksheet).

On February 7, 2016, Norfleet filed an "emergency" grievance to the FDOC reporting the alleged attempted armed rape and assault by Inmate Taylor, and requesting placement in protective custody (Request for Administrative Remedy or Appeal, ECF No. 40-1, Ex. B; *see also* Second Amended Complaint at 10).

Norfleet received notice of the DR on February 11, 2016 (Charging Disciplinary Report, Log # 119-160547, ECF No. 40-1, Ex. C). During the investigation of the DR, Norfleet submitted the following written witness statement:

> I do not know why Officer Lane would write that he saw me jump off a top bunk and hit Bobby Taylor. Bobby Taylor did say that he was familiar with the officers here and that they would cover for him. Bobby Taylor pulled a knife on me and sexually assaulted me. When the officer came to the door I was holding Bobby Taylor's right hand while Bobby Taylor repeatedly punched me in the face after I refused to suck his penis. Bobby Taylor had a knife (shank). I believe that the officers found the shank and are covering for Bobby. I was sexually assaulted and brutally beaten by Bobby Taylor. I tried to push Bobby off of me in self defense because I was in fear of my life. If I was the one beating Bobby in the face then why am I the one with all the beating marks. I would like to report the fact that officers are covering up a <u>REAL</u> attempted rape to the F.B.I.

(Witness Statement, ECF No. 40-1, Ex. D). Norfleet requested that the disciplinary team review the videotape from the camera which records shower searches to determine whether a knife was found in Inmate Taylor's possession (Documentary or

Physical Evidence Disposition, ECF No. 40-1, Ex. E). The investigating officer viewed the videotape and summarized its contents as follows:

> 8:29:45 pm Inmate Taylor placed in shower cell. Ofc. [sic] appears to be searching boxers, then boxers given back to Inmate. Officer moves an object with his foot from under shower door. Object is picked up. Cannot determine on camera what object is.

(Disposition of Videotape or Audiotape Evidence, Log # 119-160547, ECF No. 40-1, Ex. E).

A disciplinary hearing was held on March 1, 2016 (*see* Disciplinary Report Hearing Information, Log # 119-160547, ECF No. 40-1, Ex. E). Norfleet was present at the hearing and was offered staff assistance, but he declined (*id.*). The disciplinary team considered Officer Lane's statement, Norfleet's written statement, the videotape, and the photographs attached to the DR (*id.*). The disciplinary team issued a written decision finding Norfleet guilty of assault or attempted assault on an inmate, based in part on Officer Lane's statement, as well as the results of the investigation (*id.*). The disciplinary team sentenced Norfleet to 60 days in disciplinary confinement (*id.*). Additionally, Norfleet's custody status was increased to the most restrictive status, Close Management I, which includes single cell housing (i.e., solitary confinement) and more limited privileges (Second Amended Complaint at 11). *See* Fla. Admin. Code r. 33-601.800(2)(a)1., (10)–(13). No disciplinary action was taken against Inmate

Taylor (*id.*).  Norfleet was advised of his right to appeal the disciplinary decision, and

he did so by filing a formal grievance on March 2, 2016, Log # 1603-119-052 (Request

for Administrative Remedy or Appeal, ECF No. 40-1, Ex. F).  The warden, through his

representative, denied the appeal (*id.*)

Norfleet alleges he suffered physical, mental, and emotional injuries as a result

of the assault by Inmate Taylor.  Norfleet alleges that within a few hours of the assault,

his right eye swelled shut, both of his eyes blackened, the right side of his face and

head swelled, his lips swelled, he suffered deep cuts on the back right side of his head,

and his nose moved when he touched it (Second Amended Complaint at 10). Norfleet

also alleges he suffered a concussion, and he continues to suffer blackouts, severe

headaches which require prescription medication, blurred vision, dizziness, and aching

scars on his eyes, head, lips, and face (*id.* at 11).  Additionally, Norfleet alleges he

suffers anxiety, depression, nightmares, and paranoia (*id.*).

IV.    DISCUSSION

    A.    <u>Norfleet's Eighth Amendment Claims</u>

        1.    <u>Defendant Lieutenant Taylor</u>

Norfleet claims that Lieutenant Taylor violated his Eighth Amendment rights by

failing to protect him from the assault by Inmate Taylor.  Defendant Lieutenant Taylor

argues he is entitled to summary judgment in his favor (*see* ECF No. 40).  Lieutenant

Taylor argues Norfleet's allegations fail to state an Eighth Amendment violation; therefore, Taylor is entitled to qualified immunity.

Because Norfleet does not dispute that Lieutenant Taylor was acting within the scope of his discretionary authority, the burden shifts to Norfleet to show that qualified immunity is not appropriate.  *See* Lee, 284 F.3d at 1194.

Viewing the evidence in the light most favorable to Norfleet, there is insufficient evidence from which a trier of fact could reasonably infer that Lieutenant Taylor subjectively knew that Inmate Taylor posed a substantial risk of serious harm to Norfleet.  Although Norfleet alleges in his Second Amended Complaint that prison officials at Florida State Prison told prison officials at Santa Rosa C.I. that Inmate Taylor posed a safety and security risk, Norfleet does not allege any basis for his personal knowledge of this fact.  Lieutenant Taylor submitted a sworn Declaration based upon his personal knowledge, which states that Inmate Taylor was not classified as a safety or security risk.  Norfleet has not submitted any summary judgment evidence that disputes Lieutenant Taylor's statement, or that otherwise shows a genuine issue of material fact as to whether Inmate Taylor was classified as a safety and security risk, or whether Lieutenant Taylor knew that Inmate Taylor was classified as such.  Further, even if Lieutenant Taylor talked to Inmate Bobby Taylor about "the good ol' days," when Inmate Taylor was housed in Lieutenant Taylor's dormitory, and

Lieutenant Taylor "recalled violent incidents that were allowed to happen to inmate snitches" during that time, and commented that prison had "gotten soft because of snitches," no fact finder could reasonably infer from these statements that Lieutenant Taylor subjectively knew of a strong likelihood that Inmate Taylor would physically assault Norfleet.

Norfleet has the burden of showing that qualified immunity is not appropriate as to Lieutenant Taylor. Lieutenant Taylor submitted evidence that he was not aware that Inmate Taylor posed a risk of harm to Norfleet. Norfleet has not presented any evidence to the contrary. In the absence of any evidence to satisfy the subjective component of the Eighth Amendment standard, Norfleet has not shown that an Eighth Amendment violation occurred. Therefore, Lieutenant Taylor is entitled to qualified immunity on Norfleet's Eighth Amendment claim.

### 2. Defendant Officer Lane

Norfleet claims that Officer Lane violated his Eighth Amendment rights by failing to protect him from the alleged assault by Inmate Taylor (Second Amended Complaint at 7, 11–12). Norfleet specifically claims Officer Lane failed to respond to Norfleet's request to move to a different cell on February 5, 2016, and Lane failed to intervene more quickly once the assault was in progress.

Defendant Officer Lane, like Defendant Taylor, argues only the first prong of the qualified immunity analysis, i.e., that Norfleet fail to state an Eighth Amendment violation (ECF No. 32 at 7–10).    Officer Lane does not argue that the alleged constitutional violation was not "clearly established" under the second prong of the qualified immunity analysis.    Accordingly, resolution of Officer Lane's motion to dismiss turns on whether the factual allegations of the Second Amended Complaint state a plausible Eighth Amendment claim.

Norfleet alleges that on the night of the assault, he told Officer Lane that he and Inmate Taylor were "having a conflict," that Inmate Taylor had physically threatened him, and that he was afraid of Inmate Taylor.    Norfleet alleges Inmate Taylor told Officer Lane that Norfleet did not need to be moved to another cell, and Inmate Taylor said "I got this.  Ya'll already know."    Norfleet alleges a few hours later, after Officers Lane and Carter escorted Norfleet and Inmate Taylor to and from the showers, Officer Lane told Inmate Taylor to wait until he and Officer Carter were downstairs to "do whatever he was going to do," and the officers proceeded downstairs.    Norfleet alleges when Officers Lane and Carter returned to the cell approximately 5–10 minutes later, the officers watched as Inmate Taylor continued to beat Norfleet.

At the motion to dismiss stage, which is the stage of this case with regard to Officer Lane, the court must accept Norfleet's factual allegations as true.[4]  Accepting them as true, Norfleet has alleged facts which plausibly suggest that Officer Lane subjectively knew that Norfleet faced a substantial risk of a physical attack by Inmate Taylor, that Officer Lane failed to take any steps to protect Norfleet from that harm, and that there was a causal connection between Lane's actions and the Eighth Amendment violation.  Because Defendant Lane argues only the first prong of the qualified immunity analysis, his motion to dismiss should be denied.  *Cf.* Blissett v. Coughlin, 66 F.3d 531, 539 (2d Cir. 1995) (affirming that party waived qualified immunity defense at trial where the party "never articulated a qualified immunity defense distinct from their contention—the heart of their defense throughout these proceedings—that no constitutional violation occurred."); Buffington v. Balt. Cnty.,

---

[4] In support of Lieutenant Taylor's motion for summary judgment, Officer Lane submitted his own declaration stating that Norfleet never asked him for a change in cell assignment, he (Officer Lane) never told Inmate Taylor to wait until he (Lane) was gone to do whatever he was going to do to Norfleet, and he (Lane) never allowed Inmate Taylor to beat Norfleet (*see* Declaration of Brandon J. Lane ¶¶ 4, 6, 7, ECF No. 40-1, Ex. H).  Even if the court considered Officer Lane's declaration, there is a genuine issue of material fact as to whether Norfleet told Officer Lane on the evening of the assault that he feared physical harm from Inmate Taylor and thus requested to be moved to another cell, whether Officer Lane told Inmate Taylor to "do whatever he was going to do" and then left him unsupervised to do it, and whether Officer Lane delayed in intervening in the assault upon his returning to the cell.  Viewing the disputed facts in the light most favorable to Norfleet, a fact finder could reasonably infer that Officer Lane subjectively knew that Norfleet faced a substantial risk of a physical attack by Inmate Taylor, that Officer Lane failed to take any steps to protect Norfleet from that harm, and that there was a causal connection between Lane's actions and the Eighth Amendment violation.

913 F.2d 113, 120–22 (4th Cir. 1990) (concluding that a party had waived qualified

immunity where their argument "mentions qualified immunity for the

officer-defendants, but hinges the argument wholly on the lack of a constitutional

violation—it does not assert that these defendants were entitled to qualified immunity

because their conduct did not violate clearly established constitutional law."); Nelson

v. City of Albuquerque, — F. Supp. 3d —, 2017 WL 4776730, at **32–34 (D.N.M.

2017) (defendants did not adequately preserve qualified immunity's "clearly

established" element where defendants argued only that no constitutional violation

occurred); Becker v. Kross, No. 2:02-CF-24 TS, 2009 WL 819373, at **6, 10 (D. Utah,

Mar. 26, 2009) (denying one defendant's motion for summary judgment on plaintiff's

constitutional claim because there was a genuine issue of material fact as to whether

a constitutional violation occurred, and defendant did not argue that the alleged

constitutional violation was not "clearly established"); Speert v. United States, No.

Co4-1975L, 2005 WL 1645803, at *5 (W.D. Wash. July 11, 2005), *amended by*, 2005

WL 1798181 (July 27, 2005) (same).

    B.    Norfleet's Retaliation Claims

    Norfleet claims that Officer Lane retaliated against him for reporting Inmate

Taylor's attack by filing a false DR (Second Amended Complaint at 10, 12).  Norfleet

claims that Lieutenant Taylor retaliated by approving the false DR and restricting all of Norfleet's privileges (*id.*).

With respect to Lieutenant Taylor, Norfleet alleges in his Second Amended Complaint that after the alleged assault by Inmate Taylor on February 5, 2016, Officers Lane and Carter escorted Norfleet from the medical department to a different cell, and Officer Lane told him that he spoke to "the Lieutenant," and if Norfleet kept his mouth shut he would not get a DR (Second Amended Complaint at 10).  Lieutenant Taylor states in his sworn declaration that he was not on duty on the evening of February 5, 2016 (Taylor Decl. ¶ 10).  Norfleet did not submit any evidence that Lieutenant Taylor was "the Lieutenant" to whom Officer Lane referred, or that Lieutenant Taylor was on duty on the evening of February 5, 2016.  Additionally, the DR itself shows that a Lieutenant Stokes, not Lieutenant Taylor, approved Officer Lane's DR.  Viewing the evidence in the light most favorable to Norfleet, no finder of fact could reasonably infer that Lieutenant Taylor either told Officer Lane to use a DR as a means of intimidating Norfleet into not reporting Inmate Taylor's assault, or approved the DR.

To the extent Norfleet also claims retaliation by Lieutenant Taylor based upon Norfleet's being subjected to more restrictive conditions of confinement, his claim also fails.  Norfleet states that as a result of the DR, Lieutenant Taylor restricted his privileges, and his custody status changed to Close Management I.

Prior to issuance of the DR, Norfleet's custody status was Close Management

II (*see* Disciplinary Report Worksheet, ECF No. 40-1, Ex. A).  According to FDOC

policy, any decision to change a Close Management inmate's custody status or to

suspend a Close Management inmate's privileges is vested with the Institutional

Classification Team ("ICT"), not a single prison official.  *See* Fla. Admin. Code  r.

(1)(k) (defining the ICT as the team consisting of the warden or assistant warden,

classification supervisor, chief of security, and other members as necessary when

appointed by the warden or designated by rule); *see also* Fla. Admin. Code r. 33-

601.800(16) (ICT determines whether a Close Management inmate should be released

to the general population, maintained at the current custody level, or modified to

another level of Close Management); Fla. Admin. Code r. 33-601.800(12) ("The ICT

shall suspend an inmate's privileges if security and safety concerns would preclude an

inmate from receiving certain privileges.").  Norfleet failed to submit evidence from

which a fact finder could reasonably infer that Lieutenant Taylor was the but-for cause

of any post-DR change in Norfleet's custody status to a more restrictive level of Close

Management.  Therefore, Lieutenant Taylor is entitled to summary judgment on

Norfleet's retaliation claim.

Norfleet's retaliation claim against Officer Lane, based upon Lane's issuing the

DR charging Norfleet with assault or attempted assault, is foreclosed by the Eleventh

Circuit's decision in <u>O'Bryant v. Finch</u>, 637 F.3d 1207 (11th Cir. 2011).  An inmate cannot state a claim of retaliation for a disciplinary charge involving a prison rule infraction when the inmate was found guilty of the actual behavior underlying that charge after being afforded adequate due process.  <u>O'Bryant</u>, 637 F.3d at 1215.  In other words, there is no causal connection between a DR and a prisoner's freedom of speech if the disciplinary action would have been taken regardless of the prisoner's protected speech. *Id.* at 1217 (citing <u>Smith v. Mosley</u>, 532 F.3d 1270, 1278, n.22 (11th Cir. 2008).  "Any possible causal connection between the protected activity (the grievances) and the harm (the disciplinary charges and sanctions) is severed since the harm is not in reaction to any protected activity, but directly due to an improper activity."  <u>O'Bryant</u>, 637 F.3d at 1219–20.

Disciplinary hearing procedures must comply with the due process standards announced in <u>Wolff v. McDonnell</u>, 418 U.S. 539, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974), and be supported by "some evidence in the record" as required by <u>Superintendent v. Hill</u>, 472 U.S. 445, 105 S. Ct. 2768, 86 L. Ed. 2d 356 (1985).  *See* <u>O'Bryant</u>, 637 F.3d at 1213.  Adequate due process requires that the inmate have (1) advance written notice, (2) an opportunity to present witnesses and evidence at his disciplinary hearing, and (3) a written statement from the factfinder outlining the evidence relied upon and the reasons for the disciplinary action.  *See* <u>Wolff</u>, 418 U.S.

at 563–57.  A prisoner has received due process so long as there is "some evidence in

the record that supports the decision of the disciplinary board."  <u>Hill</u>, 472 U.S. at 454.

"Ascertaining whether this [due process] standard is satisfied does not require

examination of the entire record, independent assessment of the credibility of

witnesses, or weighing of the evidence."  *Id.* at 455.  According to the Supreme Court,

"the relevant question is whether there is *any evidence* in the record that could support

the conclusion reached by the disciplinary board."  *Id.* at 455–56 (emphasis added).

Applying these rules in <u>Hill</u>, the Supreme Court determined that the complaining

guard's oral testimony and written report were "sufficient to meet the requirements

imposed by the Due Process Clause."  *Id.* at 456.  The Eleventh Circuit deems <u>Hill</u>'s

teachings on the Due Process Clause relevant to retaliation claims, even though <u>Hill</u> did

not arise from the retaliation context.  *See* <u>O'Bryant</u>, 637 F.3d at 1214 n.12.

Here, Norfleet does not dispute that he received all of the procedural due

process he was due.  Further, there was some evidence to sustain the disciplinary

team's finding that Norfleet assaulted or attempted to assault Inmate Taylor.

According to Norfleet, the disciplinary team (which consisted of K.M. Demond and

L.E. Crocker (*see* Disciplinary Report Hearing Information, ECF No. 40-1, Ex. E))

stated they did not find Norfleet's version of the events credible (Second Amended

Complaint at 11).[5]    The disciplinary team's written findings indicate that they determined the videotape was insufficient to corroborate Norfleet's assertion that Inmate Taylor had a weapon (Disciplinary Report Hearing Information, ECF No. 40-1, Ex. E).  The team's findings further indicate that the team believed Officer Lane's statement that he saw Norfleet jump off the top bunk and begin repeatedly hitting Inmate Taylor in the face (*see id.*).  And the photograph of Inmate Taylor's face, which was submitted to the disciplinary team, clearly shows that Inmate Taylor suffered injuries to his face (*see id.*).[6]  There was some evidence to support the disciplinary team's finding that Norfleet assaulted, or attempted to assault, Inmate Taylor.  Therefore, under O'Bryant, Norfleet's retaliation claim fails for lack of a causal connection.

C.    Limitation on Recovery

Norfleet seeks compensatory and punitive damages for physical, mental, and emotional injuries.  Defendants Taylor and Lane contend Norfleet's allegations, that

---

[5] Norfleet's version was that he lunged at Taylor after Taylor threatened him with a shank, and Norfleet grabbed Taylor's right arm and wrist with both hands; that Taylor began punching Norfleet in the face, head, nose, and jaw with a closed fist; that Norfleet continued gripping Taylor's right arm and wrist; and that the beating lasted approximately 5 minutes.

[6] The close-up picture of Inmate Taylor shows dried blood around his left nostril and running down his top lip, and a circular scratch or mark on his left cheekbone (*see* Disciplinary Report Hearing Information, ECF No. 40-1, Ex. E).

he suffered a concussion, blackouts, headaches, dizziness, and blurry vision, are not

sufficient physical injuries to qualify for recovery for the alleged mental and emotional

injuries Norfleet suffered, pursuant to 42 U.S.C. § 1997e(e) (ECF No. 32 at 12–15; ECF

No. 40 at 17–21).  Defendants contend that although the Eleventh Circuit has not

adopted a precise definition of a "more than de minimis" physical injury, several

district courts, including this district court, have applied the following definition

articulated in <u>Luong v. Hatt</u>:

> A physical injury is an observable or diagnosable medical condition
> requiring treatment by a medical care professional.  It is not a sore
> muscle, an aching back, a scratch, an abrasion, a bruise, etc., which lasts
> even up to two or three weeks . . . .  Injuries treatable at home and with
> over-the-counter drugs, heating pads, rest, etc., do not fall within the
> parameters of 1997e(e).

979 F. Supp. 481, 486 (N.D. Tex. 1997).

The leading case on this issue from the Eleventh Circuit, <u>Harris v. Garner</u>, held

that in order to satisfy § 1997e(e), a prisoner must allege a physical injury that is more

than de minimis, but need not allege that it is significant.  190 F.3d at 1286–87.

Applying that principle to the facts of <u>Harris</u>, the court held that forcing an inmate to

"dry shave" resulted in a de minimis physical injury and therefore did not meet the

threshold requirement under § 1997e(e).[7]  *Id.* at 1287.  In holding that a prisoner must allege more than de minimis physical injury to satisfy § 1997e(e), the Eleventh Circuit intended to "fuse" the physical injury analysis under § 1997e(e) with the framework set out by the Supreme Court in Hudson v. McMillian, 503 U.S. 1, 9–10, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992), for analyzing claims brought under the Eighth Amendment for cruel and unusual punishment.  Harris, 190 F.3d at 1286.  The Harris court was careful to state that its holding did not affect its Eighth Amendment jurisprudence, and it used the Eighth Amendment standards only to guide its analysis under § 1997e(e).

Subsequent cases finding only de minimis physical injury on their facts have similarly followed Harris and found that the § 1997e(e) requirement was not satisfied. *See* Mann v. McNeil, 360 F. App'x 31, 32 (11th Cir. 2010) (plaintiff alleged vague injuries to his back, scrapes and marks on his legs, and a lapse of time in reordering his medication)[8]; Quinlan v. Personal Trans. Servs. Co., 329 F. App'x 246, 248–49

---

[7] The plaintiff (among several) who was the subject of the § 1997e(e) inquiry in Harris also alleged that defendants performed a body cavity search upon him while members of the opposite sex were present, but the court stated that only the "dry shave" incident was before the court for purposes its § 1997e(e) inquiry.  Harris, 190 F.3d at 1286–87.

[8] The undersigned cites Mann and other unpublished cases herein only as persuasive authority and recognizes that such opinions are not considered binding precedent. *See* U.S. Ct. of App. 11th Cir. Rule 36-2.  The undersigned does the same with respect to opinions of circuit courts of appeals other than the Eleventh Circuit, *see* United States v. Rosenthal, 763 F.2d 1291, 1294 n.4 (11th Cir. 1985), and any district court opinions cited herein.

(11th Cir. 2009) (asthmatic plaintiff alleged temporary chest pain, headache, difficulty breathing and periodic back pain after being transported in prison van); <u>Dixon v. Toole</u>, 225 F. App'x 797, 799 (11th Cir. 2007) (plaintiff, after being forced to sleep in "strip cell" on a concrete platform, claimed—but could not evidence—an aggravation of his preexisting injuries and exposure to Hepatitis-C from his cellmate, and further alleged bruises and welts from shackles); <u>Borroto v. McDonald</u>, No. 5:04cv165/RH/WCS, 2006 WL 2789152, at *5 (N.D. Fla. Sept. 26, 2006) (defendants allegedly punched plaintiff repeatedly in his abdomen and on the back of his head, hit him on his left ear, and picked him up off the ground and dropped him on his head, which only resulted in bruising and minimal edema of the lower left ear lobe and a red line approximately one centimeter long behind the left ear on the scalp).[9]

In this case, Defendants contend there is no genuine issue of material fact on the issue of whether Norfleet may recover compensatory or punitive damages, and Defendants are entitled to judgment as a matter of law, because Norfleet cannot demonstrate that his alleged physical injuries were more than a de minimis (ECF No. 40 at 17–21; ECF No. 32 at 12–15). Defendants contend a concussion, blackouts,

---

[9] Courts in other circuits have also determined that Eighth Amendment claims should similarly be subject to de minimis injury inquiry. *See, e.g.*, <u>Mitchell v. Horn</u>, 318 F.3d 523, 535–36 (3rd Cir. 2003) (citing <u>Harris</u> with approval and noting that its decision is in line with decisions of the Ninth, Eleventh, and Fifth Circuit Courts of Appeal) (other citations omitted).

headaches, dizziness, and blurry vision, are de minimis (ECF No. 32 at 15; ECF No. 40 at 21).

A concussion and migraine headaches may be considered more than de minimis injuries. *See* Flanning v. Baker, No. 5:12cv337/MW/CJK, 2016 WL 4703868, at *6 (N.D. Fla. Aug. 16, 2016) (unpublished), *Report and Recommendation Adopted By* 2016 WL 4703862 (N.D. Fla. Sept. 7, 2016); Payne v. Dickerson, 334 F. App'x 629, 631 (5th Cir. 2009) (in context of Fourth Amendment excessive force claim, plaintiff "made sufficient allegations that he suffered more than a de minimis injury as a result of the alleged excessive use of force as he alleges that he was thrown head first into a ditch and that he now suffers chronic migraine headaches"); B.J.R. ex rel. Garcia v. Golgart, Civil No. 11-1105 (JRT/SER), 2013 WL 3455598, at *8 n.3 (D. Minn. July 9, 2013) ("A concussion is more serious than a back contusion with no bruising or swelling and no acute distress, relatively minor scrapes and bruises and the less-than-permanent aggravation of a prior shoulder condition, or very minor injuries, likely nothing more than the temporary and slight aggravation of pre-existing conditions, all of which have been held to be de minimis.") (internal quotations and citations omitted); Johnson v. Jacobson, No. 3:06-CV-0766-H, 2008 WL 2038882, at *6 (N.D. Tex. Apr. 28, 2008) (finding that a concussion is a serious injury).

Alternatively, as to the extent of Norfleet's injuries, Defendant Taylor contends Norfleet's medical records contain no evidence to support Norfleet's allegations of his injuries (ECF No. 40 at 20). Defendant Taylor submitted a declaration from Dr. Albert C. Maier, a Senior Physician for the FDOC, which states he reviewed Norfleet's medical records, and the records do not indicate that Norfleet suffered a concussion or any "serious physical injury" on February 5, 2016; nor are any "serious physical injuries" depicted in the photograph included in Norfleet's records dated February 5, 2016 (Declaration of Dr. Albert C. Maier ¶ 2, ECF No. 40-1, Ex. I). Dr. Maier states that Norfleet's medical records are completely devoid of any objective medical data supporting Norfleet's allegations of concussion, blackouts, headaches, dizziness, blurry vision, nightmares, anxiety, depression, and paranoia (*id.*). Dr. Maier further states that Norfleet's medical records indicate that he has been provided regular medical care upon request, but Norfleet has not made any effort to seek any care, whatsoever, for any of the medical issues he claims resulted from the altercation with Inmate Taylor (*id.*). Defendant Taylor contends that due to the lack of evidence to support Norfleet's allegations, no reasonable jury could possible find that Norfleet suffered more than a de minimis injury (ECF No. 40 at 21).

As previously noted, Norfleet did not submit a response to Defendant Taylor's motion for summary judgment or Defendant Lane's motion to dismiss. Thus the only

evidence of Norfleet's alleged physical injuries is his description of them in his verified

Second Amended Complaint, where he alleges he suffered swelling of his face and

head, black eyes, cuts on his head, a concussion, blackouts, migraine headaches,

blurred vision, dizziness, and scars on his eyes, head, lips, and face that ache when he

has a headache (Second Amended Complaint at 10–11).

Dr. Maier's statements, that Norfleet's medical records and a photograph taken

the day of the assault, do not indicate he suffered any "serious" physical injury on

February 5, 2016, are inapposite, since the standard is not whether Norfleet suffered

significant or serious injury, but whether he suffered more than de minimis physical

injury.  And since neither the medical records nor the photograph were submitted to

the court, the undersigned is unable to determine whether a reasonable fact finder

could infer that the physical injuries Norfleet suffered, if any, were more than de

minimis.  Similarly, although Dr. Maier states that Norfleet's medical records do not

indicate he suffered a concussion, this statement does not refute or contradict

Norfleet's allegation that he did suffer one, especially since there is no evidence that

Norfleet was tested for a concussion.

Further, Norfleet's allegations suggest that the majority of his alleged injuries

developed after he received initial medical treatment.  For example, he alleges that

within a few hours of the incident, his right eye swelled shut, both of his eyes

blackened, the right side of his face and head swelled, and his lips swelled.  Although Dr Maier states that Norfleet's medical records do not indicate he made any effort to seek care for any of the medical issues claimed as a result of the assault, this does necessarily mean Norfleet will be unable to prove more than a de minimis physical injury at trial.  A jury may reasonably infer from the lack of objective medical evidence that Norfleet did not actually suffer the physical injuries he described, or a jury may find his description of his injuries, as well as any explanation for the lack of objective medical evidence, credible.  It is for the jury to weigh any skepticism concerning Norfleet's self-diagnosis and lack of objective medical evidence against the obvious fact that inmates, unlike plaintiffs in other settings, are generally unable to obtain medical care—and perhaps medical opinions—of their choice.

The parties do not dispute that Norfleet and Inmate Taylor engaged in a physical altercation on February 5, 2016.  Norfleet's description of his injuries and symptoms is not directly contradicted by the record, such that the court may deem them implausible and disregard them for purposes of summary judgment.  *See, e.g.,* Reid v. Sec'y, Fla. Dep't of Corr., 486 F. App'x 848, 852 (11th Cir. 2012) ("While it is true that [the inmate's] medical records do not support the version of the facts he presents in his affidavit, all this means is that there is conflict in the evidence, which we must resolve at the summary judgment stage in [the inmate's] favor."); Bowden v.

Stokely, No. 3:12cv652-J-99MMH-JRK, 2013 WL 4500462, at *14 (M.D. Fla. Aug. 22, 2013) ("To the extent Plaintiff's allegations concerning the severity of the beating and the claim of multiple injuries may be perceived as somewhat exaggerated and unsupported by the medical records, at this stage of the proceedings, the Court is unwilling to wholly discredit his version of events.").

Because a genuine dispute of material fact exists concerning whether Norfleet's alleged physical injuries were de minimis, summary judgment is not appropriate on the issue of compensatory and punitive damages. And Norfleet's liberally construed request for nominal damages is certainly not barred. *See* Brooks, 800 F.3d at 1307–09.


V.    CONCLUSION

Viewing the evidence in the light most favorable to Norfleet, there is no genuine issue of material fact as to whether Lieutenant Taylor failed to protect Norfleet from the alleged assault by Inmate Taylor, or whether Lieutenant Taylor retaliated against Norfleet for reporting Inmate Taylor's assault. Therefore, Defendant Taylor's motion for summary judgment should be granted.

With respect to Officer Lane, the allegations of the Second Amended Complaint are not sufficient to state a plausible retaliation claim against Lane, but Norfleet's factual allegations are sufficient to survive Lane's motion to dismiss as to Norfleet's

Eighth Amendment claim. And with respect to Lane's request for dismissal of Norfleet's claims for monetary damages, Lane's request for dismissal should be denied.

Accordingly, it is respectfully **RECOMMENDED**:

1.    That Defendant Taylor's motion for summary judgment (ECF No. 40) be **GRANTED**.

2.    That Defendant Lane's motion to dismiss (ECF No. 32) be **GRANTED** as to Plaintiff's retaliation claim, but **DENIED** as to Plaintiff's Eighth Amendment claim and Plaintiff's request for compensatory and punitive damages.

3.    That this matter be recommitted to the undersigned for further proceedings on Plaintiff's Eighth Amendment claims against Defendant Lane and Defendant "Officer Carter."

At Pensacola, Florida, this 27th day of November 2017.


/s/ Elizabeth M. Timothy
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

<u>**NOTICE TO THE PARTIES**</u>

      **Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**